**In re John P. McNINCH, Debtor.**

**John P. McNinch, Plaintiff,**

v.

**Mortgage America, Inc., Harris Trust Savings Bank as Trustee for the Cityscape Home Equity Loan Trust 1996–2, and Cityscape Home Equity Loan Trust 1996–2, Defendant.**

Bankruptcy No. 99–22610.
Adversary No. 99–2276.

United States Bankruptcy Court,
W.D. Pennsylvania.

July 24, 2000.

Gary W. Short, Pittsburgh, PA, for Debtor.

David Ziegler, Pittsburgh, PA, for Harris Trust Savings Bank.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Chief Bankruptcy Judge.

### Issues Presented

This adversary action is before the court in the posture of a motion to dismiss. A default judgment currently stands against assignor of the mortgage and note, Mortgage America. Plaintiff, John P. McNinch, originally asserted claims under the Pennsylvania Unfair and Deceptive Practices Act, as well as The Truth in Lending Act, against the remaining defendant, Harris Trust Savings Bank as Trustee for Cityscape Home Equity Loan Trust ("Harris Trust"). However, McNinch

agreed at oral argument that the Pennsylvania Unfair and Deceptive Practices Act claim should be dismissed so that all that remains at issue is the Truth in Lending Act claim.

In the Harris Trust Savings Bank Memorandum of Law in Support of Harris Trust Savings Bank Motion to Dismiss at pages three and four, the defense supplies a concise description of the premise of the complaint:

The basic issue in this case is whether the lender complied with the provisions of the Truth in Lending Act, 15 U.S.C. § 1601 [sic § 1601], et seq. ("TILA"); and Regulation Z, 12 C.F.R. § 226.1, et seq. Briefly stated, TILA and Regulation Z require certain disclosures and allow at least a three business day opportunity for a borrower to rescind a nonpurchase-money residential mortgage transaction[ ].

Plaintiff appears to argue that it may rescind its loan, years after closing, (i) because the initial TILA disclosures provided to the McNinches were inaccurate, thus extending the three business day period to three years, and (ii) because the loan transaction was not consummated until after delivery of the Corrected Note, thus rendering the Rescission Notice inaccurate.

Ultimately, the alleged TILA violations lead to two basic questions:

1. What is the legal effect of the First TILA Disclosure statement?

2. Was the loan agreement between McNinch and Mortgage America consummated on March 5, 1996, the date of the closing, or on March 13, 1996, the day the substituted page of the note, which included the prepayment penalty provision, was received by the McNinches?

To answer these questions, we will have to analyze the purpose of TILA. At page 6 in Plaintiff's Brief in Opposition to Defen-

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

dant's Motion to Dismiss, Plaintiff, John P. McNinch, asserts: "The [Truth in Lending] Act's purpose is 'to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him...' 15 U.S.C. § 1601."

Harris Trust Savings Bank has moved to dismiss the action arguing that TILA is incorrectly applied by the plaintiff in the present case:

> Plaintiff is attempting to confuse TILA with breach of contract principles. Plaintiff actually seems to be complaining that the terms of the loan changed between the time of his first contract with Mortgage America and the closing. If Mortgage America made promises that it did not fulfill, or acted in bad faith, Plaintiff might have a common law claim, but he does not have claim under TILA. TILA is designed to ensure that he understands the terms of the loan actually made, and has an opportunity to rescind that loan.

(Harris Trust Savings Bank Reply to Debtor's Resp. to Mot. to Dismiss at 4.) Because the claim may ultimately suffer dismissal based on whether or not the Truth in Lending Act is applicable to the facts of this case, we examine a greater portion of § 1601, as quoted by Plaintiff. 15 U.S.C. § 1601(a) provides:

> The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

Considering the posture of this case, with consideration of a motion to dismiss before the court, all reasonable inferences must be drawn in favor of the non-moving party, the plaintiff McNinch. See *Graves v. Lowery*, 117 F.3d 723, 726 (3d Cir.1997). Yet, the court is permitted to scrutinize McNinch's assertions. "[I]f the evidence [supplied by the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations removed). Harris Trust argues that McNinch is muddying the waters, that when the dust settles it will be clear that the plaintiff's claim is invalid.

After careful consideration of the pleadings and arguments, we find in favor of defendant Harris Trust.

### Facts

In February 1996, plaintiff John McNinch and his non-debtor spouse, Deanna McNinch, applied for a loan, to be secured by a non-purchase money mortgage on their residence, from Mortgage America. Mortgage America, on February 5, 1995, provided the McNinches with a first estimated Truth in Lending disclosure statement and an estimate of settlement costs. On March 5, 1996, Mortgage America and the McNinches met to close the loan. At the closing, Mortgage America provided the McNinches with various loan documents including a second Truth in Lending disclosure statement, a two page promissory note, and a Truth in Lending Rescission Notice listing March 8, 1996 as the rescission deadline.

The figures in the second TILA disclosure provided to the McNinches, and the terms of the note, differed from the first estimated TILA disclosure. For example, the interest rate was changed from 9.990 to 13.5, the amount of the loan was decreased from $318,510.00 to $310,500.00, and the payment term was changed from 30 years to 15 years. The second TILA

disclosure statement accurately reflected the ultimate legal obligations of the parties. On March 11, 1996 the proceeds of the loan were disbursed to the McNinches and various creditors to whom the McNinches were indebted. On March 13, 1996, the McNinches received an amended page to be substituted for one page of the original note. The amended page included the prepayment penalty that was not listed on the original note. The McNinches subsequently defaulted on the Note. On August 27, 1998 Harris Trust Savings Bank, as trustee for assignee of the Note, Cityscape Home Equity Loan 1996–2 Trust, brought a mortgage foreclosure action against the McNinches and obtained judgment of foreclosure against the residence. On December 11, 1998, the McNinches faxed and mailed notices of their rescission of the loan to Mortgage America and the servicing agent. John McNinch filed a Chapter 13 Bankruptcy petition on April 8, 1999, and this adversary proceeding seeking to avoid the Mortgage requesting damages on July 15, 1999.

### TILA Statute of Limitations

■ Preliminarily, Harris Trust asserts that this complaint is barred by the statute of limitations. Seeking to avoid dismissal of the complaint due to the statute of limitations, McNinch argues:

> The one year Statute of Limitations to assert a damages claim runs from the date of the "violation" not the date of the "transaction" and does not bar 1.) the [sic] a damages claim for failure to honor the McNinches['] Rescission or 2.) "disclosure violations", asserted defensively, in Recoupment[.]

(Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 18.) McNinch correctly argues that "[t]he statute of limitations period runs, not from the date of the 'transaction', but from the 'date of the occurrence of the violation.' 15 U.S.C. § 1640(e)." (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 18.) The "violation" asserted by McNinch is Harris Trust's failure to rescind after notice sent by McNinch on December 11,

1998. Because Harris Trust simply failed to act, any Harris Trust violation that might have occurred pursuant to 15 U.S.C. § 1635(b), for failure to properly respond to the McNinch rescission notice, occurred twenty days after the December 11, 1998 rescission notice:

> Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

15 U.S.C. § 1635(b). The McNinch complaint was filed on July 15, 1999, within the one year statute of limitations. Therefore, the McNinch claim against Harris Trust for failure to respond to the McNinch rescission notice survives the statute of limitations.

■ Concerning the claim for damages due to TILA disclosure violations, McNinch argues that:

> [a]lthough TILA contains a one year statute of limitations to assert a claim for damages, if a creditor files a proof of claim in a consumer's bankruptcy action, the consumer may respond with a lawsuit against the creditor and may assert a Truth in Lending claim in recoupment, even though the action is filed more than one year after the alleged Truth in Lending violation.

(Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 18.) The alleged TILA disclosure violations occurred on the date of the closing, March 5, 1996, when the allegedly incorrect date of right of rescission expiration was supplied, a date more than one year prior to the filing of the complaint. However, McNinch is correct that the one year statute of limitations does not apply to TILA violations asserted in recoupment in response to an action by a creditor to collect a debt. 15 U.S.C. § 1640(e) states in relevant part:

Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation. This subsection does not bar a person from asserting a violation of this title [15 U.S.C. § 1601 et seq.] in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law.

Pennsylvania law does not prohibit recoupment claims. See *In re DiCianno*, 58 B.R. 810 (Bankr.E.D.Pa.1986). The McNinch claims do indeed survive the TILA statutes of limitation.

### Significance of the Estimated TILA Disclosure

■ Defending the rescission of the loan more than three days following the closing McNinch asserts:

> The Debtor's rescission three years after consummation was timely because Mortgage America[ ] did not provide the Debtor with accurate, "material disclosures" required by the Truth in Lending Act. Mortgage America's Second disclosure was ineffective because it was not a result of "subsequent events", events beyond Mortgage America's control.

(Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 5.) TILA typically provides for a rescission period of three days following consummation of the loan agreement, delivery of rescission notice or delivery of material disclosures. 12 C.F.R. § 226.23(a)(3). But, "If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first." *Id.*

On December 11, 1998, McNinch faxed and mailed notices of rescission of the loan agreement. (See Pl.'s Ex. K.) McNinch argues that the rescission was timely, despite not falling within the three day limit, because the first TILA disclosure, supplied by Mortgage America, (Pl.'s Ex. A), did not match the ultimate terms of the loan.

McNinch acknowledges receipt of a second disclosure statement. (Pl.'s Ex. F.) McNinch claims that the second disclosure statement "accurately reflected the legal obligations of the parties, except the amended note's 'prepayment penalty' provision," (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 9), but argues that TILA permits *correction* of a inaccurate disclosure only as a result of subsequent events "not caused by the creditor." (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 10.) Examination of the second TILA disclosure statement belies plaintiff's assertion; the second disclosure statement actually *did* include notice of a prepayment penalty provision. It states "PREPAYMENT: If you pay off early, you will have to pay a penalty." (See Pl.'s Ex. F.) (It was the note itself that did not state the prepayment penalty on the date of closing.)

Moreover, TILA does permit correction of early disclosures. 12 C.F.R. § 226.17(f) states:

> **Early disclosures.** If disclosures required by this subpart are given before the date of the consummation of a transaction and a subsequent event makes them inaccurate, the creditor shall disclose before consummation:
>
> (1) any changed term unless the term was based on an estimate in accordance with § 226.17(c)(2) and was labeled an estimate;
>
> (2) all changed terms, if the annual percentage rate at the time of consummation varies from the annual percentage rate disclosed earlier by more than ⅛ of 1 percentage point in a regular transaction, or by more than ¼ of 1 percentage point in an irregular transaction, as defined in § 226.22(a).

The first TILA disclosure statement was clearly labeled as an estimate, and all

terms changed from the first disclosure statement were disclosed in the second disclosure statement.

McNinch argues that the changes between the initial disclosure statement and the ultimate loan were not the result of TILA "subsequent events," but bad faith on the part of Mortgage America.[2] (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 10.) The argument continues that bad faith lender activity does not constitute a "subsequent event," pursuant to § 226.17(f), and so correction of the first disclosure is a violation of TILA. McNinch, at oral argument, alleged that the difference between the first TILA disclosure statement and the terms provided at closing was the result of bait and switch tactics by Mortgage America, that Mortgage America never intended to provide the loan described in the first disclosure statement. Plaintiff concludes that the difference between the figures provided in the first estimated TILA disclosure and the ultimate terms of the loan constitute a violation of TILA. As noted earlier, default judgment has been entered against Mortgage America. Even were Harris Trust the entity that made the initial disclosure, which it is not, in analogous contexts, courts of the Eastern District of Pennsylvania have ruled that plaintiffs "cannot legitimately draw an inference from the discrepancies between the [TILA] estimates and the settlement statement that the defendants' estimates were not made in good faith." *Brophy v. Chase Manhattan Mortg. Co.*, 947 F.Supp. 879 (E.D.Pa. 1996). The *Brophy* Court granted summary judgment in favor of defendants on claims of TILA violations evidenced only by differences between TILA estimates and actual disclosures.

The *Brophy* ruling did include dictum that could be construed to suggest that in non-"residential mortgage transactions" all disclosures are final, even clearly marked estimates provided to consumers well before consummation. Accurately noting that "TILA is a strict liability statute liberally construed in favor of consumers," *id.* at 885, the Court hypothesized that "except in the residential mortgage context, any discrepancy between an actual disclosure and what a borrower is later charged ordinarily constitutes a violation under the Act." *Id.* at 866. The dictum must not be misconstrued to apply to the facts of the present case which involves (a) a non-residential mortgage and (b) a change in terms from a clearly labeled estimated TILA disclosure statement and the actual one presented at closing. The *Brophy* ruling arose out of disputed TILA disclosures under a "residential mortgage transaction." The parties agree that the instant case involves a non-"residential mortgage transaction." (See Pl.'s Brief in Opp'n to Def.'s Mot. to Dismiss n. 7.) TILA provides explicitly for correction of early disclosures and estimates. The *Brophy* court did not consider early TILA disclosure estimates in non-residential mortgage transactions.

The significance of *Brophy* for this case is its non-dictum holding that a simple difference in the disclosed loan figures between the first, (i.e."estimated"), TILA disclosure and the second, (i.e."actual"), TILA disclosure does not, in and of itself, give rise to an inference of bad faith dealings. McNinch's unfounded claims of bad faith and bait and switch tactics by Mortgage America do not constitute material questions of fact when they are evidenced *only* by "substantial variance" between the initial estimated TILA disclosure, and the ultimate terms of the Loan. As Judge Brody noted in *Brophy*, "I cannot draw the inference that the defendants' estimates were not made in good faith *solely because*

**2.** We note, however, that the initial disclosure here was clearly labeled as a non-binding estimate. Thus, applicability of the "subsequent event" language of 12 C.F.R. § 226.17(f) is of questionable relevance. Section 226.17(f)(1) specifically authorizes estimates such as that at bar and anticipates changes in terms provided by estimates and in the actual disclosure.

*the estimates vary from the settlement disclosures." Id.* at 885 (emphasis added). While the *Brophy* ruling applied in the context of "residential mortgage transactions," which is different from the McNinch loan, the reasoning of the Court is analogous and applicable to the present case. Moreover, the pending action is against an assignee who was not involved in the TILA disclosure process at all.

Seeking to capitalize on the proffered significance of his only evidence, plaintiff argues that the differences between the first TILA disclosure and the second TILA disclosure, and note, have the effect of extension of the right of rescission to

three years after consummation, because:

If the required ... disclosures are not delivered, the right to rescind shall expire 3 year[s] after consummation, upon transfer of the consumer's interest in that property or upon sale of the property, whichever occurs first....

(Pl.'s Brief in Opp'n to Def.'s Mot. to Dismiss at 12) at 12 (quoting 12 C.F.R. § 226.23(a)(3).)

This initial argument by plaintiff sets the stage for analysis of the first question: What is the legal effect of the first TILA disclosure statement? McNinch concedes receipt of the second TILA disclosure statement, which he alleges "accurately reflected the legal obligations of the parties, except the Amended note's 'pre-payment penalty' provision." (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 9.) The second statement was provided at closing of the loan. Inasmuch as the second statement was provided before the signing of the loan, what is the significance of the initial statement?

Plaintiff argues implicitly that the initial disclosure has a permanence to it, that the terms provided by Mortgage America in the first statement cannot change except for "subsequent events" which are construed by McNinch to mean events "not caused by the creditor." (Pl.'s Br. in Opp'n

to Def.'s Mot. to Dismiss at 10.) Thus, we must decide whether the first disclosure statement constituted an irrevocable offer to contract under the listed terms. As already noted, 12 C.F.R. § 226.17(f) provides for correction of early, estimated disclosures.

At the top of the first TILA disclosure statement is a caveat: "Truth in Lending Disclosure Statement, This is Neither a Contract nor a Commitment to Lend, All Terms and Conditions Herein are Estimated and May Vary for Final Closing Documents." (Pl.'s Ex. A.) This warning confounds plaintiff's suggestion of the permanence and significance of the first disclosure statement. Rather, the First TILA disclosure provided by Mortgage America was an estimate that matches the provisions of 12 C.F.R. § 226.17(c)(2)(I), authorizing estimated disclosures.

Plaintiff correctly asserts that "The [Truth in Lending] Act's purpose is 'to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him...' 15 U.S.C. § 1601." (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 6.) By being provided with a lender's estimates, the consumer acquires general information for comparison with terms available from other lenders and remains free to borrow elsewhere.

McNinch, at closing, when offered a loan that was different from that specified in the first estimated TILA disclosure statement, accepted the loan, despite the substantial variance from the terms listed in the first disclosure statement. McNinch argues that:

The McNinches detrimentally relied on Mortgage America's misrepresentations and bad faith conduct. If Mortgage America had disclosed the true credit terms on February 5, 1996, the McNinches would have sought and obtained a loan from another lender on more favorable terms.

(*Id.* at 3).

Assuming without deciding that McNinch could prove his assertions that

another lender would have provided him with a better deal, he can prove no facts to show that his reliance was justified, considering the explicit warning that the first disclosure statement was a non-binding estimate. McNinch was free to explore other opportunities upon receiving this estimate. Moreover, such blind reliance on explicitly marked estimates is misplaced so long as TILA provides for re-disclosure of early estimates through provisions such as 12 C.F.R. § 226.17(f). Arguably, the goal of TILA "to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him..." is met when the consumer is supplied with disclosure of the correct, significant terms of the actual loan prior to closing. The second disclosure statement given to McNinch at closing satisfies that goal and TILA's requirements.

Interestingly, TILA *requires* early disclosure of terms in certain types of loans. In the complaint on page 7 at ¶ 34, McNinch quotes 12 C.F.R. § 226.19(a)(1):

The TILA and Regulation Z impose special disclosure requirements for *residential mortgage transactions* covered by RESPA. Regulation Z Provides:

Residential mortgage transactions subject to REPSPA. (1) Time of disclosures. In a residential mortgage transaction subject to the Real Estate Settlement Procedures Act ... the creditor shall make good faith estimates of the disclosures required by § 226.18 before consumption, or shall deliver or place them in the mail not later than three business days after the creditor receives the consumer's written application, whichever is earlier.

(Emphasis added.) If the loan was a "residential mortgage transaction" the initial disclosure was required. In Count I of the Complaint, at ¶ 33, McNinch states: "The loan received by the McNinches from Mortgage America is a *residential mortgage transaction* as defined in the Real Estate Settlement Procedures Act, 12

U.S.C. § 2601 et seq." (Emphasis added.) Yet, McNinch changed the factual contention in subsequent filings. According to footnote 7 (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 6 (emphasis added)):

A "residential mortgage transaction" under TILA is a "purchase money" residential mortgage ("a consensual security interest ... against a consumer dwelling to finance acquisition or initial construction...").  15 U.S.C. § 1602(w). *McNinches' loan is not a "purchase money" mortgage.* Complaint, Exhibit "G."

In this case, the initial TILA disclosure was not required by TILA. The McNinch loan was not a "purchase money" mortgage subject to RESPA. The fact that TILA provides for early disclosure, in particular circumstances, *see* 12 C.F.R. § 226.17(b), is evidence that early disclosure, and its benefits, were contemplated by Congress at drafting. Despite the purpose of TILA, "to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him," the Act requires early disclosure not in all cases, but for "residential mortgage transactions" as defined in 15 U.S.C. § 1602(w). Thus, despite adoption of early disclosure in certain areas, Congress felt that the Act's purpose could be fulfilled without early disclosures, in circumstances such as those in the present case.

Considering the TILA requirement of early disclosure in certain contexts, the TILA provisions providing for correction of early disclosures, and the *Brophy* ruling that variance between estimates and terms of actual loans is not per se evidence of TILA violations, the McNinch claim that the second disclosure was ineffective cannot stand and is insufficient to defeat this motion to dismiss.

### Consummation

■ Invoking an issue of contract law, the plaintiff argues:

Mortgage America's Rescission Notice was defective because it did not clearly list the rescission deadline as three business days after "Consummation", the date the legal obligations of the parties were established, which occurred on March 13, 1996 when the McNinches "accepted" the Amended note. Since a defective Rescission Notice extends the rescission period to three years after Consummation, the McNinches' December 11, 1998 Rescission was timely.

(Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 12.) Creditor disclosure of the rescission deadline to the consumer is required by TILA under 12 C.F.R. § 226.23(b)(1). The life of the consumer's right of rescission is controlled by 12 C.F.R. § 226.23(a)(3):

> The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. *If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation,* upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first.

(Emphasis added.) McNinch's argument is that the rescission deadline was incorrectly listed on the rescission deadline disclosure, thereby extending the right of rescission to three years, rather than three days following consummation of the loan. The Right of Rescission notice, (Pl.'s Ex. H), as required by TILA, was provided by Mortgage America at the March 5, 1996 closing. Harris Trust asserts that "[t]he loan agreement was consummated on March 5, 1996," (Mot. to Dismiss at 2, see also Pl.'s Brief in Opp. To Def.'s Mot. to Dismiss at 13), pursuant to 12 C.F.R. § 226.23(a)(3), and that listing the rescission deadline as March 8, 1996, the third day following the closing, was proper.

Conversely, McNinch argues that consummation did not occur on March 5, 1996, at the closing. McNinch claims that consummation occurred when the McNinches accepted the amended note, which occurred on or after March 13, 1996. McNinch argues that March 13 is the first day that there was a writing which expressed the "meeting of the minds" of the parties.

Because plaintiff argues that the expiration of right of rescission was incorrectly listed on the TILA Right of Rescission Notice, it would follow that "[i]f notice is defective, the creditor did not deliver the 'required notice' listing the correct 'date the rescission period expires.'" (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 15.) As a result of this alleged error, "the right to rescind is extended" for three years after consummation. *Id.* Therefore, plaintiff asserts, the December 11, 1998 rescission was valid under TILA.

The issue turns on an interpretation of contract law. Defense asserts, and McNinch concurs, (*see* Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 14), that:

> The official comments to Regulation Z, 12 C.F.R. § 226.2(a)(13) explain that "consummation" [for the purposes of 12 C.F.R. § 226.23(a)(3) ] occurs when a contractual obligation on the consumer's part is created as a matter of applicable state law.... Under Pennsylvania law, a contract is complete when both parties have agreed on all essential terms....

(Mot. to Dismiss at 2, 3.) McNinch argues that the parties had not agreed to all of the essential terms on March 5, 1996; that by sending an amended note, Mortgage America indicated that it would not be bound by the terms of the first note. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 14.)

The question of whether there was a contractual "meeting of the minds" at consummation is centered on the absence of the "prepayment penalty provision" in the original note. Although the second disclosure statement, presented at closing, con-

tained notice of the prepayment penalty, McNinch argues that the absence of this provision in the note means that consummation did not occur, as there was no meeting of the minds or manifestation of intent by Mortgage America to be bound by the terms of the first note.

Yet, despite the prepayment penalty provision's failure to appear on the original note, the second disclosure, also provided at the closing, stated: "Prepayment: If you pay off early, you will have to pay a penalty." (Pl.'s Ex. F.) The first disclosure statement also provided for a prepayment penalty. McNinch argues that "[b]oth Mortgage America and McNinch agreed that the loan agreement would be reduced to a promissory note which contained a prepayment provision." (Compl. at 9 ¶ 44). The documents establish that the parties agreed, when they entered into a contract at closing, that a prepayment penalty provision was to be incorporated. Yet, McNinch posits that the parties "agreed the loan agreement would be reduced to a [written] promissory note *which contained a prepayment provision.*" (*Id.* (emphasis added)). In other words, McNinch insists that the parties agreed only to agree at a later date; i.e., that the loan was not effective until a completed, master note that incorporated the prepayment penalty provision was written. In support of this contention, McNinch argues that,

> [w]hile the Complaint doesn't state that one or both of the parties intended that the agreement was not complete before it was reduced to writing with all of the terms of the agreement in that writing, it is a reasonable inference that *both* parties had this intention, from the surrounding circumstances. If they did, there was no agreement until March 13, 1996.

(Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 15 n. 22) (citations removed.) The Court cannot conclude, on the facts of this case, that any such inference is "reasonable." The facts, as pleaded, show that, at closing, the parties agreed to all the material terms of the loan. The note, which evidenced the loan, was supplemented at closing by the oral agreement of the parties. The oral modification was confirmed in writing shortly thereafter by the amended note with the prepayment penalty added.

McNinch argues that because the parties contemplated that their agreement could not be complete before it was reduced to a writing, no contact existed before the writing. *Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 64, 563 A.2d 1182, 1186 (1989), provides:

> If the parties agree on essential terms and intend them to be binding, a contract is formed even though the parties intend to adopt a formal document with additional terms at a later date. *Johnston v. Johnston,* 346 Pa.Super. 427, 499 A.2d 1074 (1985). However, where the parties contemplate that their agreement cannot be considered complete before it is reduced to writing, no contract exists until the execution of the writing. *Essner v. Shoemaker,* 393 Pa. 422, 143 A.2d 364 (1958). The intent of the parties is a question of fact to be determined by the factfinder. *Johnston v. Johnston,* 346 Pa.Super. at 431, 499 A.2d at 1076.

Under *Krause,* it is for the finder of facts to determine whether McNinch and Mortgage America intended that their loan agreement was incomplete before it was reduced to a writing that incorporated the agreed upon prepayment penalty provision. Generally, evidence of disputed intent requires testimony. However, in this case, neither party disputes that the contract was formed and included the prepayment penalty. The only dispute concerns on what date the contract was formed.

In this case, evidence of the parties' understanding of the contract can be derived from their performance. In asking whether the contract was consummated at closing, their actions with respect to

the agreement are decisive. In the Harris Trust Savings Bank Reply to Debtor's Response to Motion to Dismiss at page four, the defense argues: "Clearly, when Plaintiff signed a note, gave a mortgage, and even obtained and spent the proceeds of his loan, he incurred a contractual obligation to the lender." Indeed, in Pennsylvania, it is "well-established that 'an offer may be accepted by conduct and what the parties d[o] pursuant to th[e] offer' is germane to show whether the offer is accepted." *Schreiber v. Olan Mills,* 426 Pa.Super. 537, 541 627 A.2d 806, 808 (1993) (quoting *Accu–Weather, Inc. v. Thomas Broadcasting Co.,* 425 Pa.Super. 335, 625 A.2d 75 (1993)). Acceptance came on March 5.[3] Although disbursement of the loans funds occurred on March 11, after the March 5 closing and the expiration of the three day TILA rescission period, there is no dispute in this case that McNinch accepted the loan proceeds and agreed to repay the loan, with its prepayment penalty intact, at closing.

The facts show that at the March 5, 1996 closing McNinch received, *inter alia,* a mortgage, a closing settlement statement, an accurate Truth in Lending disclosure statement, and a two-page promissory note. Despite the absence of a prepayment penalty in the note, the parties agreed that it would be included as a term of the loan, (*see* Compl. at 9 ¶ 44), and the TILA disclosure statement provided for such a penalty. The TILA statement provided at closing correctly reflected the nature of the loan between McNinch and Mortgage America.

McNinch and his wife signed the loan documents fully aware of the terms of the loan including the prepayment penalty provision. McNinch also received a TILA Rescission Notice providing a three day rescission grace period. The three days passed with no rescission or legal action by McNinch.

On March 11, 1996, the proceeds of the loan were disbursed and accepted by McNinch and his creditors. On or about March 13, 1996, McNinch received an amended page to the note supplied at closing that included the prepayment penalty agreed upon at closing. After defaulting, McNinch attempted to rescind the loan on December 11, 1998.

McNinch's activity at and after closing evidences acceptance of all essential terms of the loan. Arguments to the contrary are founded on nothing other than the fact that Mortgage America mailed a corrected amended note that was in accord with the parties' expressed intention and agreement. At closing McNinch didn't rescind or pursue action against Mortgage America. He did accept the loan proceeds and apply them to satisfy other debts. He did make payments. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 14.) Accordingly, we find that for purposes of 12 C.F.R. § 226.23(a)(3), "consummation" occurred at the March 5 closing.

### Assignee Liability

■ Insisting on the liability of Harris Trust, McNinch states:

> Harris Trust [as assignee of Mortgage America] can be liable for 1.) TILA violations apparent on the face of loan documents and 2.) a failure to properly respond to McNinch's Rescission[.]

(Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 16.) McNinch argues that "[w]hen Harris Trust compared the first disclosure to the Amended Note (and the second disclosure), the *substantial variance* between the terms of the two documents (*particularly the 35%+ jump in interest rate* ) showed there was a 'disclosure' violation." (*Id.*)

15 U.S.C. § 1641(a) states:

> . . . any civil action for a violation of this title . . . which may be brought against a

**3.** Examination of the calendar for 1996 reveals that March 5 was a Tuesday, March 8 was a Friday, and March 11 was a Monday.

creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, ... For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this title.

By arguing that assignee Harris Trust is liable for TILA violations apparent from the loan documents, McNinch begs the question of whether the initial disclosure statement had the legal significance and effect that McNinch proposes. Harris Trust argues compellingly that it was entitled to rely on the correct second disclosure statement, and its consistency with the amended note. The amended note was sent to the McNinches on or about March 13, and contained the prepayment penalty provision that, although absent from the original note, was agreed upon by the parties, (*see* Complaint at 9 ¶ 44), at the March 5 closing.

> The Loan Documents were assigned to Harris Trust in August 1997. [See Pl.'s Ex. J.] When Harris Trust received the documents, the Note already incorporated the allegedly substituted page. Therefore, there were no violations on the face of the Disclosure Statement apparent to Movant because that disclosure matched the terms of the Note and the other Loan Documents.

(Harris Trust Savings Bank Reply to Debtor's Resp. to Mot. to Dismiss at 6.) This point is not contested by McNinch. The second disclosure statement was an accurate representation of the legal rights and duties of each party.

McNinch asserts that Harris Trust should have known about the alleged TILA violations by comparing all of the disclosure statements with the loan docu-

ments. We disagree. The *Brophy* court ruled that variation between estimated and final disclosure statements is not per se evidence of TILA violations. Also, courts have construed TILA assignee liability restrictively. In *Jordan v. Chrysler Credit Corp.*, 73 F.Supp.2d 469 (D.N.J.1999), despite plaintiff's arguments that assignees should have known of TILA violations by comparing certain financial records, the district court held that assignees are not liable for TILA violations apparent through examination of extra-TILA-disclosure documents. Quoting the Eleventh Circuit opinion, *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 709–710 (11th Cir.1998), the *Jordan* court noted:

> Under the [plaintiff's] own argument, ... we would need to resort to evidence or documents extraneous to the disclosure statement. The plain language of the statute forbids us to do so. As the Seventh Circuit noted, such an interpretation of TILA would: impose a duty of inquiry on financial institutions that serve as assignees. Yet this is the very kind of duty that the statute precludes, by limiting the required inquiry to defects that can be ascertained from the face of the documents themselves.

*Jordan, supra,* 73 F.Supp.2d at 475. The *Jordan* court dismissed the plaintiff's claim because there was no TILA violation apparent on the disclosure documents. We note that McNinch's claim against assignee Harris Trust is different from *Jordan* because of the existence of the initial estimated disclosure statement; in *Jordan* there was only one set of TILA disclosures. However, the analysis holds true.

Assuming that Mortgage America violated TILA, the question becomes: Was Harris Trust required by TILA to examine the initial disclosure statement and to compare it with the actual loan? A correct and proper second disclosure statement was included in the loan documents. Considering the restrictive construction of TILA assignee liability, Harris Trust's duty was simply to ensure that the loan had a

matching accurate TILA statement paired with it, and nothing more. Therefore, Harris Trust, as assignee, is not liable itself for any of Mortgage America's violations associated with the first disclosure.

■ McNinch also asserts that Harris Trust can be liable for a failure to properly respond to the McNinch rescission. 15 U.S.C. § 1641(c) states: "Any consumer who has the right to rescind a transaction under section 125 [15 U.S.C. § 1635] may rescind the transaction as against any assignee of the obligation."

> According to the McNinch argument:
>
> McNinch faxed a notice of rescission to Harris Trust's loan servicer, Ocwen Federal Bank on December 18, 1998. Complaint, para. 29, Exhibit "K". At that time, Harris Trust was under an obligation to honor the rescission.

(Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss at 17.) If, as assignee, Harris Trust failed to honor a properly tendered rescission it would be liable for damages.

> Except as otherwise provided in this section, any creditor [or assignee pursuant to 15 U.S.C. § 1641(c) ] who fails to comply with any requirement imposed under this chapter [15 U.S.C. § 1631 et seq.], including any requirement under section 125 [15 U.S.C. § 1635], or chapter 4 or 5 of this title [15 U.S.C. § 1666 et. seq. or § 1667 et. seq.] with respect to any person is liable to such person . . .

15 U.S.C. § 1640(a). Although assignees can be liable for failure to honor a rescission, the rescission notice tendered by McNinch was not within the three-day rescission period provided by TILA. Assuming that the McNinch rescission was provided for by TILA, it was through the extension of the rescission deadline due to alleged Mortgage America TILA violations. We have already rejected that theory. There is no evidence McNinch can produce that will show a TILA violation "apparent on the face of the disclosure statement." 15 U.S.C. § 1641(a). Here, the second disclosure statement matched the actual loan terms. The operative TILA statement was the second disclosure, which properly reflected the legal obligations of the parties.

## Conclusion

In conclusion, consideration of all of the relevant facts has provided a basis to answer the two questions with which we began. First, what is the legal effect of the first TILA disclosure statement? Considering 1.) the caveat at the top of the form that it was an estimate and not a binding contract, 2.) the fact that TILA provides for mandatory early disclosure in other contexts and permits changes to estimated early disclosure in this context, and 3.) the correct and accurate second disclosure provided before the closing, the first estimate disclosure cannot have the significance that McNinch attributes. The first disclosure statement was not an offer to contract, nor does TILA contemplate its irrevocability.

The second question is: Was the loan agreement between McNinch and Mortgage America consummated on March 5, 1996, the date of the closing, or on March 13, 1996, the day the substituted page of the note, which included the prepayment penalty provision, was received by the McNinches? The loan was consummated on the date of the closing, March 5, so the TILA rescission notice provided by Mortgage America was accurate and valid. At closing, the McNinches were aware of the cost of their credit.

Despite McNinch's argument that the parties agreed that the contract would not exist prior to a written master document, the parties' undisputed conduct belies the assertion. McNinch's argument is based solely on the absence of the prepayment penalty provision in the original note. Yet, both TILA disclosure statements provided for a prepayment penalty, and McNinch admits having knowledge of, and agreeing to, the provision at closing. McNinch fails on this point as well.

Thus, there is no construction of the facts, drawing all reasonable inferences in favor of the plaintiff, upon which relief can be granted. Even though this complaint falls within the applicable statute of limitations, the motion to dismiss the complaint will be granted. An appropriate order will be entered.